# United States Court of Appeals
## For the First Circuit

No. 25-1225

VICTOR GEOVANY LOPEZ MARTINEZ; M.G.L.G.,

Petitioners,

v.

TODD BLANCHE,[*] Acting Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Montecalvo, Rikelman, and Aframe,
<u>Circuit Judges</u>.

SangYeob Kim, with whom Gilles Bissonnette, Chelsea Eddy, American Civil Liberties Union of New Hampshire, Irene C. Freidel, and PAIR Project were on brief, for petitioners.

Nathan P. Warecki and Nixon Peabody LLP on brief for former Immigration Judges, Appellate Immigration Judges, and Members of the Board of Immigration Appeals, as amici curiae, in support of petitioners.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Todd Blanche is automatically substituted for former Attorney General Pamela J. Bondi as Respondent.

Adam J. Kessel and Fish & Richardson P.C. on brief for Immigration Law Professors, as amici curiae, in support of petitioners.

Sabrineh Ardalan and Harvard Immigration and Refugee Clinical Program on brief for the American Immigration Lawyers Association and Center for Gender & Refugee Studies, as amici curiae, in support of petitioners.

Jennifer A. Singer, Senior Trial Attorney, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, with whom Brett A. Shumate, Assistant Attorney General, Civil Division, and Shelley R. Goad, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

April 23, 2026

**AFRAME**, <u>Circuit Judge</u>.  Victor Geovany Lopez Martinez is a Honduran citizen.  He brings a petition for review challenging the Board of Immigration Appeals' ("BIA") denial of his applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA") based on his political opinions and religion.[1]  Lopez contends that, in rejecting these claims, the BIA wrongly concluded that his opposition to gangs categorically is not a political opinion and failed to address adequately his religion-based claims.  We grant the petition and remand for further proceedings.

## I.

## A.

Lopez and his minor son arrived in the United States in August 2017.  Because Lopez did not possess a valid visa or other entry document, he was detained pending a credible fear interview by an asylum officer.  Following the interview, the officer referred Lopez's case to an immigration judge ("IJ").  A few months later, the Department of Homeland Security issued Lopez a notice to appear and initiated removal proceedings.  Just shy of a year after his arrival in the United States, Lopez applied for, among other relief, asylum and withholding of removal with his son as a

---

[1]    Lopez also applied for protection under the Convention Against Torture but does not pursue that claim in this Court.

derivative applicant.[2]  In so doing, he claimed that "he reasonably fear[ed] returning to Honduras because of his religion, his family relationship to his son, . . . and his political opinion[,] which was his expressed opposition to the gangs."  The IJ convened a removal hearing to consider Lopez's applications.

Lopez submitted affidavits and testified in support of his claims.  We summarize that evidence here.  See Barnica-Lopez v. Garland, 59 F.4th 520, 525 n.1 (1st Cir. 2023) (noting that we draw the facts from the administrative record).

Lopez is a devoted evangelical Christian who "spread the word of God" in his local Honduras community, focusing on members of the Barrio 18 and MS gangs.[3]  Lopez "spent a lot of time talking to gang members" in order "to encourage them to leave the gang and live a good life."  Through his preaching, Lopez told gang members that he "did not agree with what they did."

In 2014 or 2015, Lopez met a young man whom he initially convinced to leave his gang and attend church.  Ultimately, however, the man told Lopez that he "needed to leave because the

_____

[2]    Lopez's son also applied separately for the same relief on the same grounds asserted by Lopez.  Because Lopez was the lead respondent before the agency and the only one who testified, we focus our discussion on him.  See Chun Mendez v. Garland, 96 F.4th 58, 61 n.1 (1st Cir. 2024).

[3]    In Honduras, Barrio 18 is also known as the 18th Street Gang, and MS refers to *Mara Salvatrucha* or MS-13.

gang had ordered him to be killed for abandoning the gang and joining the Church."

Lopez became known in his community as a religious leader. After Lopez began evangelizing, the Barrio 18 gang started throwing rocks at his house, which he believed they did to intimidate him and prevent him from preaching. Separately, in 2017, three Barrio 18 members gestured to Lopez from a bus stop and then started shooting at him. Lopez believed that the gang targeted him because of his preaching and, specifically, for his efforts to convince gang members to leave their gang and join the Church. Gang members also threw rocks at Lopez and other churchgoers when they left services, and one gang member told Lopez's sister that "she was just a lying preacher and that soon [sh]e would see what w[ould] happen to religious people . . . ." Additionally, Lopez learned of a pastor in another town whom a gang member had murdered.

At one point, the Barrio 18 gang attempted to influence and recruit Lopez's son. When Lopez confronted the gang to oppose this recruitment effort, gang members brandished guns, threatened to kill Lopez, and stated that they would kidnap his son. Lopez believed that he would increase his risk of harm if he reported the gang violence against him to the police because the Honduran police were corrupt and cooperated with the gangs.

In addition to evidence about his personal plight, Lopez submitted country conditions information about Honduras which included a report authored by the United Nations High Commissioner for Refugees. The report noted that Honduran "[g]angs are reported to exercise extraordinary levels of social control over the population" and do not tolerate signs of disrespect, including "resisting a child's recruitment into gang activities . . . ." Further, the report observed that participating in certain religious organizations can be viewed as undermining or challenging gang authority. Such "persons perceived by a gang . . . as contravening its rules or resisting its authority may be in need of international refugee protection on the grounds of their (imputed) political opinion . . . ." The report concluded that "expressing objections to the activities of gangs may be considered as amounting to an opinion that is critical of the methods and policies of those in control and, thus, constitute a 'political opinion' within the meaning of the refugee definition."

**B.**

As pertinent to this appeal, the IJ rejected Lopez's claims for asylum and withholding of removal for two independent reasons. First, the IJ concluded that Lopez was not credible because of inconsistencies between his initial statements to the

asylum officer at the border and his later submissions to the immigration court.

Second, as to the asylum claim, the IJ held that, even if Lopez had been credible, he had "not met his burden of proof to show that he [was] the victim of past persecution, or has a well-founded fear of future persecution, 'on account of' his membership in a cognizable particular social group."[4] The IJ construed the particular social group as "law abiding citizen[s]" or Lopez's "family unit."[5] Critically, the IJ did not address Lopez's claims based on political opinion or religion.

Following the IJ's adverse ruling, Lopez appealed to the BIA. In its decision, the BIA "assum[ed] arguendo that [Lopez] testified credibly," but nevertheless found "no clear error in the [IJ]'s alternative finding that he did not show a nexus between the harm that he fears and a protected basis under the INA." Unlike the IJ, the BIA recognized that Lopez asserted a political opinion claim, which it initially characterized as based on his "being opposed to gangs." Later in its decision, the BIA cited

_____

[4] The IJ further held that Lopez could not establish eligibility for withholding of removal because he failed to substantiate his asylum claim, which holds applicants to the lower burden of showing a "well-founded" fear as opposed to the more stringent "more likely than not" withholding of removal standard.

[5] Lopez no longer seeks asylum or withholding of removal based on social group membership. At oral argument, he made clear that he presses claims based only on his political opinion and religion.

- 7 -

Ramos-Gutierrez v. Garland, 110 F.4th 1, 5 (1st Cir. 2024), and Matter of S-E-G, 24 I. & N. Dec. 579, 589 (B.I.A. 2008), to reject Lopez's political opinion claim on the ground that "resisting gang recruitment does not constitute an imputed or actual political opinion." Lopez timely petitioned this Court for review.

## II.

Where, as here, the BIA does not expressly adopt the IJ's decision, we review the BIA's decision, not the IJ's. Contreras v. Bondi, 134 F.4th 12, 18 (1st Cir. 2025). In so doing, we review the BIA's legal conclusions de novo. Mendoza v. Bondi, 133 F.4th 139, 145 (1st Cir. 2025). Lopez argues that the BIA erroneously denied his applications for asylum and withholding of removal because it (1) wrongly analyzed his political opinion claim and (2) failed entirely to address his religion-based claim. We address each argument in turn.

## A.

An applicant seeking asylum "must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). One who seeks withholding of removal must show that their "life or freedom would be threatened" on these same protected grounds. See id. § 1231(b)(3)(A); Chavez v. Garland, 51 F.4th 424, 429-30 (1st Cir. 2022) (noting the standard of proof for withholding of removal is

more restrictive than that for asylum).  The "one central reason" test allows for "the possibility that multiple motivations can exist" for persecution.[6]  Khalil v. Garland, 97 F.4th 54, 62 (1st Cir. 2024) (citation modified).

A political opinion "must involve some support for or disagreement with the belief system, policies, or practices of a government and its instrumentalities . . . or a group that plays some other similar role in society."  Chavez, 51 F.4th at 430 (quoting Zelaya-Moreno v. Wilkinson, 989 F.3d 190, 199-200 (2d Cir. 2021)).  Notably:

> [P]olitical opinions may be intertwined with ostensibly non-political issues -- so that evaluating what constitutes a political opinion for asylum [or withholding] purposes "involves a complex and contextual factual inquiry into the nature of the . . . applicant's activities in relation to the political context in which the dispute took place."

Zelaya-Moreno, 989 F.3d at 196 (quoting Hernandez-Chacon v. Barr, 948 F.3d 94, 103 (2d Cir. 2020)).

Political opinion claims may be actual or imputed.  Chavez, 51 F.4th at 430.  An applicant who brings an actual political opinion claim "must (1) show that he holds a political

---

[6]    There is a circuit split on whether the "one central reason" test applies to withholding of removal claims or whether a more lenient "a reason" standard applies.  Pineda-Maldonado v. Garland, 91 F.4th 76, 90 n.5 (1st Cir. 2024).  Because our resolution here does not hinge on the appropriate standard, we do not resolve the issue.  See id.

- 9 -

belief, (2) prove that the persecutors perceived that political belief, and (3) prove that the persecution was because of that political belief." Id. For an imputed political opinion claim, an applicant "must show that (1) the persecutor perceived him to hold a political belief, and (2) the persecution was because of that perceived political belief." Id. Thus, in an actual political opinion case, the applicant must establish that the persecution is because of a truly held political belief. See Zelaya-Moreno, 989 F.3d at 196. And in an imputed political opinion case, the inquiry centers on the belief imputed to the applicant by the persecutor regardless of whether the applicant in fact holds that belief. See id.; Alvarez Lagos v. Barr, 927 F.3d 236, 254 (4th Cir. 2019).

Here, Lopez contends that the BIA erred in narrowing his political opinion claim from generally "express[ing] opposition to the gangs" to the more limited "resisting gang recruitment." The government responds that the BIA accurately characterized Lopez's political opinion as "opposing the gangs" at an early point in its decision but concedes the BIA "used less-than-perfect wording" later on. It says nevertheless that we should reject Lopez's petition because there was no evidence that Lopez held a political opinion in opposition to gangs. As best we can tell, the BIA rejected Lopez's political opinion claim based on what it views as a categorical rule that "resisting gang recruitment does not

- 10 -

constitute an imputed or actual political opinion." Even if Lopez's political opinion claim rested only on resistance to gang recruitment (which it did not, as he asserted a broader claim based on gang opposition), the BIA was wrong to adopt a categorical rule that such resistance can never constitute a political opinion.[7]

That is due in part to the fact that, in certain locations, gangs may take on a quasi-governmental role such that opposition to them is similar to opposing a government. See Zelaya-Moreno, 989 F.3d at 200 ("[U]nder appropriate circumstances, even overtly apolitical or nongovernmental organizations may take on a political valence such that support or opposition to them can constitute a political opinion."); see also Hernandez-Chacon, 948 F.3d at 103 ("Gangs control much of El Salvador . . . ."); Alvarez Lagos, 927 F.3d at 244 (noting a neighborhood in Honduras is "effectively controlled by the Barrio 18 gang"). Whether a particular gang constitutes a political entity or only a criminal one is, of course, a question that is

---

[7] To the extent that the BIA meant to base its conclusion rejecting Lopez's political opinion claim on the view that Lopez presented insufficient evidence based on the information about his resistance to the gang's effort to recruit his son, that basis also would fail. As discussed above, Lopez presented evidence about his gang opposition that extended beyond the gang's effort to recruit his son; the BIA does not address that evidence at all in its analysis of the political opinion claim. See Contreras, 134 F.4th at 21 (stating that the "failure of the BIA to consider significant record evidence constitutes a 'legal error' and may warrant remand" (citing Diaz-Valdez v. Garland, 122 F.4th 436, 445-46 (1st Cir. 2024))).

"highly context-dependent and fact-intensive."  Zelaya-Moreno, 989 F.3d at 197.

The BIA nonetheless concluded that resistance to gang recruitment can never constitute an actual or imputed political opinion.  To do so, it relied on two cases, Ramos-Gutierrez, 110 F.4th 1, and Matter of S-E-G, 24 I. & N. Dec. 579.  Neither one supports such a broad proposition.

In Ramos-Gutierrez, we denied a petition to review the BIA's decision denying an asylum claim.  110 F.4th at 3.  In doing so, we stated that "resisting gang recruitment does not create the kind of defined social group contemplated under the asylum requirements," and we found that the petitioner had failed to establish a sufficient nexus between his political opinion and his harassment by a Salvadoran gang.  Id. at 7 (emphasis added).  We did not hold, however, that resistance to gang recruitment can never, no matter the circumstances, constitute an actual or imputed political opinion for purposes of an asylum or a withholding of removal claim.

Matter of S-E-G is of a similar stripe.  There, the applicants "did not establish what political opinion, if any, they held."  24 I. & N. Dec. at 589.  Although the applicants had refused to join a gang, the BIA concluded that they could not substantiate their political opinion claim because they did not provide evidence that their refusal was grounded in an anti-gang

political opinion.  Id.  In other words, Matter of S-E-G stands only for the proposition that political opinion claims based on resisting gang recruitment must be substantiated with evidence of the opinion or an imputed opinion.  The BIA subsequently recognized this case's limited holding, cautioning that "Matter of S-E-G[] . . . should not be read as a blanket rejection of all factual scenarios involving gangs."  Matter of M-E-V-G, 26 I. & N. Dec. 227, 251 (B.I.A. 2014).

Thus, the BIA wrongly rejected Lopez's political opinion claims based on a categorical rule derived from Ramos-Gutierrez and Matter of S-E-G.  The through-line for these cases and others like them is instead that a successful applicant must establish a nexus between an actual or imputed political opinion and subsequent persecution by a gang.  See, e.g., Alvizures-Gomes v. Lynch, 830 F.3d 49, 53 (1st Cir. 2016) (finding no nexus because gang was motivated by desire to increase its ranks, not petitioner's political views); Beltrand-Alas v. Holder, 689 F.3d 90, 94 (1st Cir. 2012) (similar, as to gang's greed).

The nexus inquiry is inherently fact-intensive and complex.  See Castro v. Holder, 597 F.3d 93, 106 (2d Cir. 2010) (noting that political opinion claims require a "complex and contextual factual inquiry" (quoting Zhang v. Gonzales, 426 F.3d 540, 548 (2d Cir. 2005))).  Country conditions reports and related evidence may assist in such an inquiry.  See Alvarez Lagos, 927

F.3d at 244, 251-52 (noting that expert testimony and "voluminous documentary evidence" could satisfy nexus requirement as to imputed political opinion claim); Castro, 597 F.3d at 106 (requiring "careful consideration of the broader political context" to properly evaluate a political opinion claim).

The nexus requirement means that merely showing that there was gang violence toward someone opposed to the gang or its recruitment efforts is insufficient to establish a connection between the gang's conduct and a political opinion. See I.N.S. v. Elias-Zacarias, 502 U.S. 478, 482 (1992) (holding that resistance to guerilla recruitment was not on its own a political opinion because there was no evidence that the resistance was politically based); Mayorga-Vidal v. Holder, 675 F.3d 9, 18 (1st Cir. 2012) ("[M]ere refusal to join a gang, without more, does not compel a conclusion that the alleged persecutor viewed the alien's resistance as an expression of a political opinion."). But further factual development could establish that the applicant's opposition was politically-based and the gang's conduct was connected to that opinion. See Hernandez-Chacon, 948 F.3d at 103-04 (suggesting feminist stance against gangs could form the basis of a political opinion claim); Alvarez Lagos, 927 F.3d at 254-55 (concluding that the failure to pay a gang and fleeing Honduras could establish an imputed political opinion claim).

We hold today only that there is no categorical bar to political opinion claims resting on resistance to gang recruitment or opposition to gangs. We join other circuits in so concluding. See Hernandez-Chacon, 948 F.3d at 103-05 (finding the agency failed to adequately consider political opinion claim based on resistance to a gang and remanding); Alvarez Lagos, 927 F.3d at 251 (similar); Cantarero Castro v. Att'y Gen., 832 F. App'x 126, 132-33 (3d Cir. 2020) (similar); Aguilar v. Att'y Gen., 703 F. App'x 139, 141, 145-46 (3d Cir. 2017) (similar); Rodriguez-Castro v. Barr, 814 F. App'x 283, 284 (9th Cir. 2020) (similar).

When evaluating political opinion claims based on resisting gang recruitment or gang opposition, the factfinder must determine whether the applicant has an actual or imputed political opinion; if so, it must then conduct a fact-intensive assessment of the claim to determine if there is a nexus between the opinion and the gang's conduct. Successful applicants will submit persuasive evidence showing, inter alia, (1) that they possess a political opinion, or that the gang attributed a political opinion to them, and (2) a connection between the gang conduct at issue and the actual or imputed political opinion. On remand, the BIA should reevaluate Lopez's political opinion claims using this approach.[8]

---

[8] The BIA may need to remand to the IJ to complete fact-finding in order to perform this analysis.

- 15 -

**B.**

We close by addressing whether the BIA failed to adequately address Lopez's religion-based claims. Lopez contends that the BIA's brief reference of his "seek[ing] asylum based on his religion," without any further discussion, requires further explanation. We agree.

We expect the BIA to address the IJ's "findings, implicitly if not explicitly, on all grounds necessary for decision." Escobar v. Garland, 122 F.4th 465, 480 (1st Cir. 2024) (quoting Un v. Gonzales, 415 F.3d 205, 209 (1st Cir. 2005)). This requirement extends to the BIA's obligation to address critical evidence of persecution. See Paye v. Garland, 109 F.4th 1, 9 (1st Cir. 2024). Here, although Lopez raised his religion-based claims squarely before the IJ and the BIA, the IJ did not address the claims at all and the BIA paid them lip service by giving them a single mention without providing any analysis.[9] That is inadequate. The BIA must consider Lopez's religion-based claims on remand.

**III.**

For the reasons stated, we **grant** the petition for review, **vacate** the BIA's decision, and **remand** to the BIA for further proceedings consistent with this opinion.

---

[9] The government conceded at oral argument that the BIA and the IJ did not address Lopez's religion claim.

- 16 -